**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

_____

| | |
|---|---|
| **ANGELA MCDONALD,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )          **No. 09-cv-02264-STA-dkv** |
| | ) |
| **NYK LOGISTICS (AMERICAS), INC. and** | ) |
| **NYK LOGISTICS (AMERICAS), INC.-ETA** | ) |
| **DIVISION,** | ) |
| | ) |
| **Defendants.** | ) |

_____

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
_____

Before the Court is Defendant NYK Logistics (Americas), Inc.'s Motion for Summary Judgment (D.E. # 20) filed on September 30, 2010.  For the reasons set forth below, the Motion for Summary Judgment is **GRANTED**.

### BACKGROUND

On November 20, 2007, Angela McDonald ("Plaintiff") filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on retaliation.  The EEOC issued a Dismissal and Notice of Rights.  On April 30, 2009, Plaintiff filed the current Complaint alleging retaliation in violation of Title VII of the Civil Rights Act ("Title VII") and asking for both compensatory and punitive damages in a total amount of no less than two million ($2,000,000) dollars.  The following facts are undisputed for purposes of this Motion unless otherwise noted.

NYK Logistics (Americas), Inc. ("Defendant") provides third-party logistic services,

1

including transportation, warehousing and distribution, freight forwarding, and international network solutions.  Def.'s Statement of Undisputed Facts ¶ 1.  Defendant hired Plaintiff in September 2005.  (*Id.* ¶ 2.)  Plaintiff worked on the Documentation Team and, in January 2007, she accepted the position of Team Lead.  (*Id.*)

Defendant states that Plaintiff accepted the Team Lead position with the understanding she would receive a raise.  (*Id.*)  Plaintiff disputes the characterization of that statement and notes that she did not take the position with the "understanding" that she would receive the raise; rather, she took the position on a "promise" that she would receive the raise.  Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 2.  Plaintiff expressed that the new position would not be worth her time if she did not get the raise.  Def.'s Statement of Undisputed Facts ¶ 2.  In fact, Plaintiff notes that Defendant's offer to increase her pay was the sole consideration for her acceptance of increased responsibility and workload.  Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 2.

Plaintiff, however, did not receive a raise until August 2007; although, Defendant did make the raise retroactive to May 1, 2007.   Def.'s Statement of Undisputed Facts ¶ 3.

During the delay in receiving the raise, Defendant states that Plaintiff thought the Account Operations Manager at the time, Sarah Ordonez ("Ordonez"), was "blowing [her] off," and that the Plaintiff's raise was just slipping her mind.  (*Id.* ¶ 4.)  Plaintiff states that she complained about the delay to the Human Resources Department in April 2007 and further states that this is when she actually decided she was going to go to the EEOC.  Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 4.

On May 9, 2007, Plaintiff learned that Ordonez had sent the request for the promotion

approval on May 1, 2007 and that Ordonez initiated the Employee Status Form for the promotion to be effective as of May 1, 2007.  Def.'s Statement of Undisputed Facts ¶ 4.  On May 24, 2007, Plaintiff received an email telling her that local management was continuing to work on resolving the raise issue.  (*Id.* ¶ 5.) Plaintiff was later told that she would get the raise when employees received normal raises at the end of the fiscal year.[1]  (*Id.* ¶ 6.)

Plaintiff believed that there was, in her terms, a "mis-communication problem."  (*Id.*) Judy Huse ("Huse"), Defendant's Human Resource Manager, told Plaintiff that Ordonez had tried to get "this fixed."  (*Id.*)  Huse stated that she would make resolving this raise issue a priority.  (*Id.*)

During the summer of 2007, a new Accounting Operations Manager, Larry Payton ("Payton"), arrived, and a period of time passed in which there was an overlap between the former manager, Ordonez, and the new manager, Payton.  (*Id.*)  On July 5, 2007, Plaintiff sent an email to Payton letting him know that she would not be offended if he felt like he needed to conduct further research regarding the raise.  (*Id.*)

On July 2, 2007, Tammy Fisher ("Fisher") arrived as the new Accounts Payable Manager.  (*Id.* ¶ 10.)  At that time, all of the Accounts Payable Department employees were female, and all of the Documentation Team employees were female.  (*Id.*)  Plaintiff explained to Fisher that she had not received the raise and that she had addressed the issue with Payton and Ordonez and was unhappy Payton was dragging his feet.  (*Id.* ¶ 27.)

---

[1]  Plaintiff disputes this fact; however, Plaintiff only notes that the fact is "[d]isputed to the extent that [Plaintiff] was told at the time she took over as Team Lead that she would not receive her raise until the end of the fiscal year."  Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 6.

Additionally, Plaintiff informed Fisher that she had told Payton that if she (Plaintiff) did not get her raise that she was going to the "EEO." (*Id.*) Defendant states that Fisher believed "EEO" referred to some type of Equal Employment Officer, as Fisher was familiar with in her last job at Regions Bank. (*Id.*) Plaintiff, however, notes that this belief was unreasonable and not sufficiently worthy of credence. Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 27. To that point, Plaintiff submits that Fisher testified that the Defendant does not have such a position nor has it ever had such a position of "Equal Employment Officer". (*Id.*) Further, Plaintiff highlights the fact that Fisher failed to identify in Defendant's Employee Handbook any reference to such a position. (*Id.*)

Additionally, Plaintiff notes that Fisher further testified Payton was aware Plaintiff was going to the EEOC. (*Id.*) In fact, Plaintiff states that Payton told her that it would not be necessary for her to go to the EEOC. (*Id.*)

Defendant submits that Plaintiff never told Fisher that she believed she had been discriminated against because of her gender and that Fisher was not aware of Plaintiff ever having made any such allegations to anyone. Def.'s Statement of Undisputed Facts ¶ 28. Actually, Defendant notes that Plaintiff even admitted in her deposition that she never told anyone that she believed that she had been discriminated against because she was a woman. (*Id.* ¶ 29.) Defendant states that Plaintiff's complaint was simply that she had been done wrong because she had not gotten her promised raise. (*Id.*)

Plaintiff, on the other hand, states that she believes Fisher made discriminatory comments

about her and was routinely disrespectful to her at least in part because of her sex.[2]  Pl.'s Resp.

to Def.'s Statement of Undisputed Facts ¶ 29.  Plaintiff additionally states that she held a good

faith belief that Defendant was engaging in unlawful employment practices as Defendant failed

to give her the promised raise.  (*Id.*)  Plaintiff does, however, admit that she did not allege sex

discrimination against Payton.  Def.'s Statement of Undisputed Facts ¶ 30.

 In July 2007, Plaintiff visited the EEOC.  (*Id.* ¶ 31.)  She did not file a charge at that

time.  (*Id.*)  Defendant notes that Plaintiff testified that the EEOC representative told her she did

not have a case.  (*Id.*)  Defendant further notes that Plaintiff, in her testimony, recognized that

most of the employees, including her supervisors, were white, that there were many more

females than males, that there were no issues concerning religion or age, and that she was not

disabled.  (*Id.*)  Moreover, Defendant states that Plaintiff did not tell Payton or anyone in

Management that she had visited the EEOC.  (*Id.*)

 Plaintiff states that she went to EEOC in July 2007 to become better informed about her

rights as an employee and the remedies available to her.  Pl.'s Resp. to Def.'s Statement of

Undisputed Facts ¶ 31.  Plaintiff again states that Fisher and Payton were both aware she was

going to the EEOC.  (*Id.*)  Moreover, Plaintiff notes that she told other employees[3] that she was

---

[2]  Plaintiff, here, cites to paragraph four of the Declaration of Angela McDonald.  This paragraph
includes in relevant part:

> During the course of [Defendant's] delay and lack of accountability concerning their
> promise to me in regards to my pay raise I felt that I was disrespected at least in part
> because of my sex, and I had a genuine belief that their actions in failing to provide
> my raise for approximately seven months after my assumption of additional
> workload was an unlawful business practice.

[3]  To support this fact, Plaintiff cites to her deposition; however, within the cited deposition
pages, the Plaintiff only mentions that she "believe[d] Nicole Brown knew."  McDonald Dep.

going to the EEOC.  (*Id.*)

On August 1, 2007, upper management approved Plaintiff's raise along with two other

employees' raises.  Def.'s Statement of Undisputed Facts ¶ 7.  In asking for the raises, Payton

noted: "[w]e are asking two of these individuals to take on added responsibilities as Team

Leaders and I believe they should be compensated accordingly."  (*Id.*)  On August 6, 2007,

Defendant approved the specific amount of the raise, from $12.61 per hour to $13.80 per hour,

and, as noted above, the raise had an effective date of May 1, 2007.  (*Id.* ¶ 8.)  Plaintiff received

retroactive pay to May 1, 2007 in the amount of $831.79.  (*Id.*)

After receiving the retroactive pay, Plaintiff inquired as to retroactive pay for the period

from January 25 to April 30.  (*Id.* ¶ 9.)  And, the very next day, Plaintiff again inquired as to this

retroactive pay.  (*Id.*)  Plaintiff does not dispute these facts, but adds that the date of the first

email inquiry was August 27, 2007 and the date of the second email inquiry was August 28,

2007, and further notes that these were the two days preceding the final written warning

memorandum dated August 29, 2007 discussed below.   Pl.'s Resp. to Def.'s Statement of

Undisputed Facts ¶ 9.

On August 29, 2007, Defendant gave Plaintiff a final written warning and removed her

from the Team Lead position without loss of pay.  Def.'s Statement of Undisputed Facts ¶ 35.

Fisher wrote the final written warning.  (*Id.*)  The written warning referenced an incident in

which Plaintiff and one of her Documentation Team members, Nicole Brown ("Brown"), had

become involved in retrieving the personal belongings of a co-worker, Heather Hammonds

("Hammonds").  (*Id.*)  Defendant states that it had terminated Hammonds that day, and

---

167:1-2.

Hammonds was not allowed to go back to her office. (*Id.*) Further, Defendant states that Fisher assigned Judy Pruett ("Pruett") to collect Hammonds' personal belongings and bring them to the front desk; instead, however, Plaintiff started going through Hammonds' desk. (*Id.*) Defendant submits that Pruett told Plaintiff that management was handling this and to stop, but that Plaintiff refused to listen, threw Hammonds' things in a box, and walked past Fisher. (*Id.*) Additionally, Defendant submits that Plaintiff, at this time, was also reported to have been heard using profanity while talking on her cell phone, slamming doors, and making a scene in the office. (*Id.*)

Plaintiff, on the other hand, states that her version of the events concerning the "Hammonds incident" is completely irreconcilable with the version put forth by Fisher. Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 35. Plaintiff states that Defendant never instructed her to refrain from getting the personal items from Hammonds' desk or tell her that her actions were against company policy or against any orders from management. (*Id.*) Moreover, Plaintiff asserts that she was never directly told to stop moving Hammonds' personal items. (*Id.*) In fact, Plaintiff states that Fisher thanked her and was grateful for the assistance that Plaintiff lent in Hammonds' termination. (*Id.*) Plaintiff emphatically states that she would not have done anything to place her job in jeopardy. (*Id.*) Additionally, Plaintiff denies using profanity while on the cell phone, throwing items around, or otherwise using any profanity. (*Id.*)

Plaintiff further states that Debra Randolph ("Randolph") is Fisher's main witness to these events. (*Id.*) Plaintiff highlights the fact that Randolph's version of the incident is markedly different from Fisher's version. (*Id.*) According to Randolph, Fisher was the one who

raised her voice.  (*Id.*)  Moreover, Randolph did not witness Plaintiff on the cell phone nor did

she witness any cursing on the part of the Plaintiff.  (*Id.*)  As an aside, Plaintiff further adds that

Fisher testified that she did not know how to handle the situation.  (*Id.*)

The final written warning dated August 29, 2007, detailed events which occurred on

August 28, 2007.  Def.'s Statement of Undisputed Facts ¶ 36.  The written warning included:

"[Plaintiff] allowed Nicole Brown to demonstrate the same behavior and she is her Team Lead."

(*Id.*)  The warning also included:

> [Plaintiff] has continuously made threats about going to the EEO if Management did
> not give her a raise and back date it to January.  She has not demonstrated that she
> is a Leader nor has she demonstrated any support to the new Managers.  She has told
> [Payton] and [Fisher] that she had never asked for the Team Lead role.  She
> threatened to quit if we did not get her raise handled.

(*Id.*)

Defendant submits that when Plaintiff's attorney questioned Fisher regarding the notation

that Plaintiff had "continuously made threats about going to the EEO," Fisher responded: "Not

really.  Continuously–she continuously complained about her raise.  She had already gotten her

raise.  So she was still continuing to complain about it."  (*Id.* ¶ 37.)  Moreover, when questioned

as to what way Plaintiff had threatened Management, Fisher testified: "That if she didn't get this,

she was going to quit; if she didn't get this, she wasn't going to do this.  I mean, it was just

never, Here's my problem, would you please take care of it?  It was, if you don't take care of it, I

am going to do this."  (*Id.*)

Plaintiff, however, states that the document speaks for itself--that one of the factors noted

in the final written warning was that Plaintiff threatened to go to the EEO.  Pl.'s Resp. to Def.'s

Statement of Undisputed Facts ¶ 37.  Plaintiff submits that on its face, the document clearly

shows that Plaintiff's EEOC activity was significant factor worth describing and incorporating into the final written warning.  (*Id.*)

Further, Plaintiff notes that Fisher's alleged misunderstanding in regards to what "EEO" means, as mentioned above, is immaterial because both Payton and the Defendant's Human Resource Department reviewed the written warning.  (*Id.*)  Plaintiff notes that neither of these parties saw a need to make any changes in the language of this memorandum.  (*Id.*)

With regard to the "Hammonds incident", Fisher gave Brown a documented verbal warning.  Def.'s Statement of Undisputed Facts ¶ 38.  Fisher emphasized to Brown that she should use her own judgment and should not allow other people to influence her.  (*Id.*)  Fisher testified that "[p]retty much what [Brown] was saying [was] that, I never would have done this, [Plaintiff] told me to do this."  (*Id.*)  Defendant notes that the reason for the difference in the discipline between Plaintiff's final written warning and Brown's documented verbal warning was that Plaintiff was the Team Lead and Brown was her subordinate.  (*Id.*)

Almost one month after the "Hammonds incident", on September 28, 2007 Defendant terminated Plaintiff's employment.  Def.'s Statement of Undisputed Facts ¶ 11.  Plaintiff's duties were absorbed by Randolph.  (*Id.*)  Plaintiff does note in one sentence within her Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment that the day after the Plaintiff received the final written warning, she went back to the EEOC.  Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J, 6.

About the time of her termination, Fisher accused Plaintiff of having scanned something

incorrectly because Plaintiff was upset about not receiving her raise.[4]  Def.'s Statement of Undisputed Facts ¶ 12.  Plaintiff denies these allegations.  Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 12.  Defendant initially placed Plaintiff on administrative leave.  (*Id.*) Defendant terminated Plaintiff two weeks later.  (*Id.*)  A description of the Documentation Team's responsibilities and the specifics of the alleged misconduct are discussed below.

Defendant engages freight carriers to ship goods on behalf of its customers.  Def's Statement of Undisputed Facts ¶ 13.  The Documentation Team is responsible for scanning and indexing documents from the freight carriers.  (*Id.*)  Specifically, the carriers send their invoices to Defendant, and members of the Documentation Team receive the carriers' invoices by mail, scan them, and index them as carrier invoices to be paid through Defendant's Accounts Payable Department.[5]  (*Id.*)

Defendant invoices its customers and makes a profit based on the margin between what Defendant charges its customers and what Defendant has paid to its carriers.  (*Id.* ¶ 14.) Defendant's customers do not know what Defendant has paid to its carriers and do not know the profit margin, which Defendant describes as highly sensitive information.  (*Id.*)  When a carrier invoice is scanned and properly indexed as such, it does not go to the customer.  (*Id.*)

The Documentation Team also scans and indexes Bills of Lading which are documents by a carrier to a shipper acknowledging that specified goods have been received as cargo for

---

[4]  According to Plaintiff, the primary documents upon which the Defendant relies have not been produced.  Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 12.

[5]  Plaintiff disputes the facts mentioned in this paragraph.  Plaintiff, however, in her response, does not address the Defendant's facts specifically.  The facts Plaintiff alleges in this response, however, are detailed below.   Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 13.

conveyance.  (*Id.* ¶ 15.)  Bills of Lading do not indicate price information.  (*Id.*)  Some of Defendant's customers require that Defendant's invoices to them be supported by copies of the applicable Bills of Lading.  (*Id.*)  When a Bill of Lading is scanned and properly indexed as such, it is available to the customer along with Defendant's invoice.  (*Id.*)

If a carrier invoice were to be improperly indexed as a Bill of Lading, instead of a carrier invoice, the customer would then be privy to the exact amount Defendant has paid a carrier and could determine Defendant's profit margin for that load.  (*Id.* ¶ 16.)  This is what was discovered to have occurred in mid-September 2007 on four separate loads for one of Defendant's most sensitive accounts–the Columbus Distributing account.  (*Id.*)  This resulted in Defendant having to quickly reduce its price and costs the company a significant loss of revenue.[6]  (*Id.*)

Plaintiff, however, states that the "Columbus Jobs" were routinely handled in a distinct manner from other jobs.  Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 13.  Specifically, Plaintiff notes that the Invoicing Department would review and sort out all of the documents for the Columbus Distributing account. (*Id.*)  The Invoicing Department would then identify the documents and tell the Documentation Department how to index each of the documents.  (*Id.*)  Then, prior to the release of the documents, the Invoicing Department would verify the documents and would ultimately be responsible for the release of the documents.  (*Id.*)

According to the Defendant, investigations determined that Plaintiff, who handled

---

[6]  Plaintiffs dispute this fact by again stating that Defendants have failed to produce any of the documents alleged to be mis-scanned and mis-indexed and that during the alleged investigation, Plaintiff was not allowed to review these documents.  Additionally, while not directly disputing the Defendant's facts mentioned in this paragraph, Plaintiff states that Fisher's comments about what was allegedly mis-scanned and mis-indexed are based solely upon Fisher's memory from more than three years ago.  Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 16.

Columbus Distributing account documents, was the person who mis-indexed the documents. Def.'s Statement of Undisputed Facts ¶ 17.  Plaintiff disputes this fact.  Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 17.          Defendant notes that in investigating the problem with the Columbus Distributing account, Randolph, Fisher, and Payton met separately with the Plaintiff and other individuals on the Documentation Team as well as individuals from the Invoicing Department to determine whether there was a system glitch and, if not, how such critical errors could have occurred during a short span of time when there had been no such problems in the past.  Def.'s Statement of Undisputed Facts ¶ 17.  Plaintiff, however, highlights the fact that the investigation was conducted by three individuals who had less than a combined six months with the Defendant.  Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 17.  In fact, Plaintiff states that Fisher testified that she did not know how the Columbus Distributing account actually received their invoices.  (*Id.* ¶ 13.)  Further, Plaintiff notes that Fisher testified that the indexing could have been changed by others after the Plaintiff allegedly mis-scanned the documents.[7]  (*Id.* ¶ 17.)

Defendant asserts that Fisher, Randolph, and Payton determined that the Plaintiff was responsible for each of these occurrences.  Def.'s Statement of Undisputed Facts ¶ 18.  The specific facts used in making this determination include: the documents in question were

---

[7]  Specifically, Fisher testifies that:

> Q.     When a document is indexed, can somebody go in and change the indexing?
> A.     The ones that are authorized.  There are people authorized to do that.
> Q.     Who would be authorized to do that?
> A.     There are several.  The documentation team and our billing department has that capability.

Fisher Dep. 64:18-24.

stamped with Plaintiff's initials; Plaintiff was the person who ordinarily handled scanning and

indexing for the Columbus Distributing account; and the individual who was responsible for

auditing (checking the documents before giving them to the Documentation Team for scanning

and indexing) specifically recalled giving these documents to the Plaintiff.  (*Id.*)  Plaintiff

disputes these facts by simply stating that there is no mention in the Fisher declaration of the

auditor's alleged review process conducted prior to the documents being delivered to the

Documentation Team for scanning.   Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 18.

The Columbus Distributing account problem first came to Fisher's attention on

September 14, 2007.  Def.'s Statement of Undisputed Facts ¶ 19.  Defendant's Operations

Management forwarded Fisher a copy of an email dated September 10, 2007, "from the Vice

President, National Accounts to another [of Defendant's] Vice President regarding Columbus

Distributing having called for the comparison of costs versus invoices for two loads."  (*Id.*)

Defendant notes that the customer should not have had that cost information.  (*Id.*)  Operations

Management then reviewed the Columbus Distributing account paperwork and discovered that a

carrier invoice had been scanned as a Bill of Lading and attached to Defendant's invoice to

Columbus Distributing.  (*Id.*)  The email to Fisher also noted that Operations Management had to

quickly lower its pallet cost which equated to a margin loss of $9,000.00 on this one lane for the

year and further note that "[i]n my thirteen years I have not seen any trucker's invoice go out

with our invoices to the customer, this particular account is sensitive and unfortunately is based

on trust as most relationships are and is in jeopardy."  (*Id.*)  Plaintiff disputes this last fact and

states that Fisher testified routine mistakes occurred concerning the mis-scanning of the very

document types in question–invoices and bills of lading.[8]  Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 19.

Fisher then wrote to the Defendant's Vice President of Human Resources on September 14, 2007 noting that a fourth incident of Columbus Distributing account mis-indexing had been discovered and referencing that a temporary employee stated that Plaintiff mentioned "shredding invoices."  Def.'s Statement of Undisputed Facts ¶ 20.  Plaintiff disputes ever shredding invoices or telling a temporary employee about shredding invoices.  Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 20.

Additionally, Defendant states that near the same time of the mis-indexing discoveries, Fisher and others became aware that there were hundreds of missing carrier invoices in Accounts Payable.  Def.'s Statement of Undisputed Facts ¶ 21.  Pruett, Freight Accounts Payable Team Lead, sent an email to Fisher on September 14, 2007, stating that she was getting swamped by carriers calling due to non-payment and that the invoices were not in the Defendant's system.  (*Id.*)  Pruett further noted that all of the missing invoices were in the A's, and it was as though there was an internal "black hole" for mail for the month of May.  (*Id.*)

Defendant states that when Plaintiff was question by Randolph and Fisher concerning the mis-indexing of the Columbus Distributing documents, she stated that she believed that the mis-

---

[8]  To support this statement, Plaintiff cites to Fisher's deposition.  The deposition reads:

> Q.   Was this the first time documents have been scanned improperly at NYK Logistics?
> A.   This particular error.  Errors occurred every day, people make errors, but this particular material risk error was the first time it was brought to anyone's attention and acknowledged by management.

Fisher Dep. p. 57:15-22.

indexing was accidental.  (*Id.* ¶ 22.)  Fisher and Randolph strongly doubted that these errors

could be accidental since Plaintiff had not made such errors in the past and no one recollected a

time in the past in which any customer had received a carrier invoice with the customer's own

invoice.  (*Id.*)  Plaintiff denies knowing why, or if, the documents were scanned incorrectly.

Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 22.

Defendants state that among the persons questioned by Fisher was Lori King ("King"), a

member of the documentation team.  Def.'s Statement of Undisputed Facts ¶ 23.  King informed

Fisher via email dated September 14, 2007 that:

> Around two months ago, I was at [Plaintiff's] cubicle and we were talking about her
> having so much trouble getting her pay increase, so then she herself told me that she
> had taken some mail out of the office and threw it in the trash.  She said that one way
> or the other she was going to get her money.  I feel it is my responsibility to let
> management know that this occurred.  I would like to keep this confidential.

(*Id.*)  Plaintiff denies ever having this conversation with King.   Pl.'s Resp. to Def.'s Statement

of Undisputed Facts ¶ 23.  Plaintiff disputes that she has any knowledge about or was in any way

involved with missing invoices or missing mail.  (*Id.* ¶ 21.)

Fisher forwarded King's email to Ms. Baglin ("Baglin"), Vice President of Human

Resources, informing her that King sent this information after she (Fisher) had asked King to

show her how the process worked.  Def.'s Statement of Undisputed Facts ¶ 24.  Via email,

Baglin instructed Fisher to proceed with a meeting with Plaintiff and to put her on a paid

administrative leave.  (*Id.*)  On September 15, 2007, Fisher placed Plaintiff on a paid

administrative leave, and then on September 28, 2007, Plaintiff was terminated.  (*Id.*)

According to the Defendant, it terminated Plaintiff's employment because Fisher and

management believed Plaintiff had deliberately sabotaged the company by mishandling the

Columbus Distributing account and discarding company mail because of her unhappiness with delays in her pay raise and her continuing complaints regarding the pay raise being retroactive to January 2007.  (*Id.* ¶ 25.)  Defendant submits that the mis-indexing of carrier invoices regarding the Columbus Distributing account caused significant loss as the company eventually lost the Columbus Distributing account within six months--a "very high profile customer."  (*Id.*)  Defendant further states that because Fisher believed Plaintiff had intentionally sabotaged the company, Plaintiff would have been terminated for this alone regardless of any discipline in the past.  (*Id.* ¶ 26.)

Plaintiff, on the other hand, highlights the fact that "[m]anagement did not determine that these alleged acts were sabotage.  Rather, they 'said this may–this could have been done intentionally.'"  Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 25.  Plaintiff further states that any attempt at such sabotage would have been immediately caught upon review.  (*Id.*)  Moreover, Plaintiff asserts that the procedures in place on the Columbus Distributing account made Fisher's belief unreasonable and not sufficiently worthy of credence.  (*Id.* ¶ 26.)  Moreover, Platiniff notes that Defendant has a system of disciplining an employee: 1) verbal warning; 2) written warning; 3) final written warning; and 4) termination, and that these procedures were not followed during Plaintiff's termination.  (*Id.*)

After her termination, Plaintiff filed a charge with the EEOC in late November 2007 alleging only "retaliation."  Def.'s Statement of Undisputed Facts ¶ 32.   Moreover, Defendant states that Plaintiff specifically testified that the retaliation was "for trying to get my raise."  (*Id.*)  Additionally, Defendant states that Plaintiff went to the EEOC because she believed the EEOC would make sure that if an employer said an employee would get a raise, then they would give a

raise.  (*Id.*)  Plaintiff, on the other hand, states that she went to the EEOC because she believed that they would make an employer do what was right and cease unlawful business practices. Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 32.

Defendant highlights the fact that the first time Fisher became aware that Plaintiff had gone to the EEOC was when Defendant's Corporate Counsel informed her in 2008 that a charge had been filed by Plaintiff some time in late 2007.  Def.'s Statement of Undisputed Facts ¶ 28. Plaintiff disputes this and states that Fisher and Payton were both aware that Plaintiff was going to the EEOC.  Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 28.

When Plaintiff was asked what the "unlawful practice" was that she complained about internally as referenced in her charge, Plaintiff answered "standing up for myself and wanting my raise."  Def.'s Statement of Undisputed Facts ¶ 33.  Plaintiff further testified that "when [Fisher] felt I went against her words and went out there and helped Heather Hammonds with the –the reason of the write up . . . , I felt like it was her way of getting rid of me because she felt like I wasn't listening to her."  (*Id.*)

In its Motion for Summary Judgment, Defendant argues that Plaintiff's alleged protected activity should be analyzed under the opposition clause and that under the opposition clause Plaintiff is unable to meet the first element necessary to make out a prima facie case of retaliation, that she engaged in protected activity protected by Title VII.  Plaintiff asserts that it is important to note that whether the protected activity is "participation" or "opposition", the second element of a prima facie case of retaliation requires Plaintiff to prove that the activity was known by the employer.  Defendant highlights that Plaintiff has put forth "absolutely no evidence" Defendant was aware of Plaintiff's visit to the EEOC.  As such, because Defendant

was not aware of that visit, then the activity which the Defendant knew about, the Plaintiff's threat to go to the "EEO", must be the focus of the protected activity analysis. Consequently, Defendant argues that this activity should be analyzed under the opposition clause. Defendant further argues that Plaintiff cannot meet the requirement under the opposition clause that she had a good faith belief that any practice was unlawful under Title VII, that is, that the delay in her promised raise was because of sex, race, etc. Therefore, Defendant argues that summary judgment should be granted as Plaintiff has not put forth sufficient evidence to establish the four elements necessary to make out a prima facie case of retaliation.

Plaintiff, on the other hand, argues that Defendant's Motion should be denied because she can sufficiently establish the elements necessary to prove a claim of retaliation under Title VII. Plaintiff argues that she should be afforded protection under the participation clause. Plaintiff states that she did in fact visit the EEOC with the full intent of filing a charge in July 2007 and in August 30, 2007, and, as such, she engaged in protected activity and should be given exceptionally broad protection under Title VII. Additionally, Plaintiff contends that she is also entitled to protection under the opposition clause. Plaintiff asserts that she did oppose a practice she believed to be discriminatory. In fact, Plaintiff states that the record in this case is clear in that Plaintiff "clearly thought

that her employer's refusal to give her the pay raise was unlawful (or to use her terms 'not right')." Thus, Plaintiff asserts that she is entitled to protection under both the participation and opposition clause. Moreover, Plaintiff submits that Defendant knew Plaintiff "was engaging in protected activity," that Plaintiff suffered adverse employment action, and that there was a causal connection between the protected activity and the adverse employment action. Therefore,

Plaintiff argues that she has put forth sufficient evidence to make out a prima facie case of retaliation.

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(a) provides that the

> court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[9]

In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.[10]  When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."[11]  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[12]  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[13]  When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

---

[9] Fed. R. Civ. P. 56(a).  The new text of Rule 56(a) became effective December 1, 2010. According to the official comments following Rule 56, "[t]he standard for granting summary judgment remains unchanged."

[10] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[11] *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

[12] *Matsushita*, 475 U.S. at 586.

[13] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

19

one-side that one party must prevail as a matter of law."[14]

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[15]  In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [his] asserted causes of action."[16]  Finally, the "judge may not make credibility determinations or weigh the evidence."[17]

## ANALYSIS

In her Complaint, Plaintiff alleges that Defendant's termination of Plaintiff constitutes retaliation in violation of Title VII.  In her Charge of Discrimination filed with the EEOC, Plaintiff also mentions the "disciplinary action" she received prior to her discharge.  Title VII prohibits discrimination in employment on the basis of "race, color, religion, sex, or national origin."[18]  Title VII also prohibits retaliatory discrimination against an employee "because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."[19]  To make out a prima facie case of retaliation under § 2000e-3(a), a plaintiff must establish that:

---

[14] *Id.* at 251-52 (1989).

[15] *Celotex*, 477 U.S. at 322.

[16] *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

[17] *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

[18]  42 U.S.C. § 2000e-2(a)(1).

[19]  42 U.S.C. § 2000e-3(a).

(1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took an adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action.[20]

As to the first prong of this test, whether the plaintiff engaged in a protected activity, the the Court must first consider whether the retaliation claim is based on an allegation that the employee participated in any proceeding under Title VII (the so-called "participation clause") or opposed a practice declared discriminatory under Title VII (the "opposition clause") to determine the Court's scope of review of the employer's alleged action.[21]  "The distinction between employee activities protected by the participation clause and those protected by the opposition clause is significant because federal courts have generally granted less protection for opposition than for participation in enforcement proceedings."[22]  Plaintiff argues that this first prong of the test is met under either the participation or the opposition clause.  Defendant, on the other hand, argues that Plaintiff's activity should be analyzed under the opposition clause, and, as such, Defendant asserts that the first prong of the test is not sufficiently established.

**Participation Clause**

The Sixth Circuit has explained that a prerequisite for protection under the participation clause is "the instigation of proceedings leading to the filing of a complaint or a charge, including 'a visit to a government agency to inquire about filing a charge[.]'"[23]  The Sixth

---

[20]  Martin v. Toledo Cardiology Consultants, Inc., 548 F.3d 405, 412 (6th Cir. 2008).

[21]  Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1313 (6th 1989).

[22]  *Id.* at 1312.

[23]  *Id.* at 1313 (quoting Polk v. Yellow Freight System, Inc., 801 F.2d 190, 200 (6th 1986)).

Circuit has noted that "merely threatening to file a charge should not be construed under the participation clause."[24]  Importantly, if the alleged activity is considered under the participation clause, the law affords "exceptionally broad protections" to persons who have "participated in any manner" in Title VII proceedings.[25]

Plaintiff argues the protected activity, here, is "participation" because the Plaintiff visited the EEOC office in July 2007 and in August 30, 2007.  The Court agrees.  The Plaintiff did engage in protected conduct by visiting a governmental agency, namely the EEOC, to inquire about filing a charge.  Therefore, under the participation clause, the Plaintiff engaged in protected activity, thus, meeting the first prong of the test.

After meeting this the first prong of the test, the Plaintiff, however, is unable to meet the second prong of the test, that this exercise of protected rights was known to the Defendant. Plaintiff cited many instances in which management, specifically Fisher and Payton, was made aware that she was going to go to the "EEO",[26] but nowhere in the record is there evidence that

---

[24] *Id.* at 1313 n.3.

[25] Johnson v. Univ. of Cincinnati, 215 F.3d 561, 582 (6th 2000) (quoting *Booker*, 879 F.2d at 1312).

[26] Instances cited by Plaintiff to show that management was aware that Plaintiff "was going to go" to the EEOC include:  "Fisher testified that Larry Payton was aware that [Plaintiff] was going to the EEOC.  Larry Payton told [Plaintiff] it would not be necessary for her to go to the EEOC."  Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 27. "Both Tammy Fisher and Larry Payton were aware that [Plaintiff] was going to the EEOC."  (*Id.* ¶ 28.)  "Fisher and Payton were both aware that [Plaintiff] was going to the EEOC as supported by Fisher's testimony.  Further, [Plaintiff] had told other employees that she was going to the EEOC."  (*Id.* ¶ 31.)  "Fisher admits that [Plaintiff] told both her and Larry Payton that she was going to go to the EEOC."  (*Id.* ¶ 36.)  The final warning letter included: "[Plaintiff] has continuously made threats about going to the EEO if Management did not give her a raise and back date it to January." Def.'s Statement of Undisputed Facts ¶ 36.  "One of the factors of the alleged final written warning was the fact that [Plaintiff] threatened to go to the EEO."  Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 37.

management knew that the Plaintiff actually visited the EEOC.[27]   Therefore, even looking at the

evidence in the light most favorable to the Plaintiff, if the Court finds that protected activity

falls within the "participation" category, then the Plaintiff cannot make out a prima facie case

for retaliation under Title VII as the Plaintiff did not demonstrate that the Defendant had

knowledge of that protected activity.

**Opposition Clause**

As for the opposition clause, the Sixth Circuit has explained that "any activity by the

employee prior to the instigation of statutory proceedings is to be considered pursuant to the

opposition clause."[28]   The Sixth Circuit has given examples of conduct protected by the

opposition clause, including "complaining to anyone (management, unions, other employees, or

newspapers) about allegedly unlawful practices; refusing to obey an order because the worker

thinks it is unlawful under Title VII; and opposing unlawful acts by persons other than the

employer-e.g., former employers, union, and co-workers."[29]   Importantly, the opposition must

be based on "a reasonable and good faith belief that the opposed practices were unlawful.   In

other words, a violation of Title VII's retaliation provision can be found whether or not the

challenged practice ultimately is found to be unlawful."[30]

---

[27] The Plaintiff does make the statement in her Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment that "[a]fter [Plaintiff] actually informed [Defendant] of her intent to visit and the actual visit, [Defendant] took two separate adverse employment actions against her."   However, the Plaintiff cites to no evidence on the record to support this statement.

[28] *Booker*, 879 F.2d at 200.

[29] *Johnson*, 215 F.3d at 579.

[30] *Id.* at 579-80.

As demonstrated by the numerous citings on the record, including the note in the Plaintiff's final written warning, the Defendant did have knowledge of Plaintiff's threats to go to the EEOC.  The Court, however, finds that looking at the evidence in the light most favorable to the Plaintiff, Plaintiff's opposition was not based on a reasonable and good faith belief that the opposed practices were unlawful.  From the evidence adduced by both the Plaintiff and Defendant, when Plaintiff mentioned the letters E-E-O, she mentioned them in terms of not receiving a raise–not in terms of discrimination based on race, religion, sex, national origin, etc. In fact, Plaintiff states that she "clearly thought that her employer's refusal to give her the pay raise was unlawful."[31]  Although Plaintiff does state in her Declaration that she "felt that [she] was disrespected at least in part because of [her] sex," there is no evidence in the record that Plaintiff told anyone that she had been discriminated against on the basis of her gender. Plaintiff admitted this in her deposition:

> Q.    The fact is you never told anyone at NYK Logistics that you believe that you were being discriminated against because you're a woman; isn't that right?
> A.    That's correct.
> Q.    But you did believe that you'd been done wrong because you had not gotten the raise that you say you'd been promised; is that correct?
> A.    Yes, sir.[32]

 Defendant states, and the Court agrees, that Plaintiff is asking the Court to read out of section 2000e-3(a) the words "made an unlawful employment practice by this subchapter" so that protected opposition would include opposing just "any practice."  Consequently, the Court finds

---

[31]  Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J., 7.

[32]  McDonald Dep. p. 26:13-22.

that Plaintiff did not engage in protected activity under the opposition clause.  As such, the Court finds that Plaintiff is unable to make out her prima facie case of retaliation under either the opposition or participation clause.

## **CONCLUSION**

For the reasons set forth above, Defendant NYK Logistics (Americas), Inc's Motion for Summary Judgment is **GRANTED**.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: January 19th, 2011.
